**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Case No. 1:22-cr-171 (JMC)** |
| v. | : | |
| | : | |
| PAULA ANN CONLON, | : | |
| | : | |
| Defendant | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Defendant Paula Ann Conlon to 60 days of incarceration, a 36-month term of probation, 60 hours of community service, and $500 in restitution.

**I.      Introduction**

Defendant Paula Ann Conlon, and her co-defendant, Stacy Lee Bond, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on September 23, 2022, (ECF No. 36 ¶ 6) reflects a sum of more than $2.7 million for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $ $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Defendant Conlon pled guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a period of incarceration is appropriate in this case because: (1) weeks before January 6, 2021, the defendant sent messages encouraging political violence;(2) she observed chaos and violence on restricted Capitol grounds before entering the Capitol Building, including watching other rioters climb scaffolding, yelling at officers herself to "back off," and even was, along with Bond, pushed away by an officer who had been attempting to move back the crowd at the Northwest Terrace; (3) she entered the Capitol Building through a shattered window by the Senate Wing Door, walked to a sensitive area of the Building (S-140), and appeared to have taken photos and/or video throughout the Building and Capitol grounds; (4) after she left the Capitol Building, she remained on Capitol grounds for over an hour observing clashes between rioters and officers; (5) in connection with her arrest in this case, she attempted to hide an AR-15-style firearm and ammunition from the FBI by stashing them in bushes located near three schools, which sent those schools into lock down status; and (6) her criminal history, while relatively minor, demonstrates a history of unwillingness to adhere to the law.

The Court must also consider that Conlon's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on its large numbers to both overwhelm police officers who were trying to prevent a breach of the Capitol Building and disrupt the proceedings therein. Here, the facts and circumstances of Conlon's crime support a sentence of 60 days of incarceration, a 36-month term of probation, 60 hours of community service, and $500 in restitution in this case.

## II.      Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* ECF 36 (Statement of Offense), ¶ 1–7.

*Defendant Conlon's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Conlon traveled with co-defendant Bond to the District of Columbia. They stayed at a hotel in the District of Columbia for two nights and left on January 7, 2021. Conlon admits that the purpose of her trip to the District of Columbia with Bond was to protest Congress' certification of the Electoral College and what she believed was a fraudulent presidential election.  ECF No. 36 ¶ 8.

Conlon—wearing a distinctive red coat and carrying a flagpole—and Bond—wearing a distinctive gray hoodie—joined the crowd that attended the "Stop the Steal" rally and the mob that traversed the restricted Capitol grounds toward the Capitol building.  Pictures taken by Bond show that he and Conlon approached the Capitol from the west, walking up to the Northwest Scaffolding constructed on the Senate-side of the West Front for the upcoming Presidential Inauguration, with Bond's photographs revealing other members of the mob climbing scaffolding in front of Conlon and Bond.  *See, e.g.*, Images 1 through 4.


Image 1


Image 2



Image 3



Image 4

After ascending toward the Northwest Courtyard, Bond took additional pictures while with Conlon, including some of police in riot gear.  *See* Image 5.



Image 5

At approximately 2:50 p.m., MPD body-worn camera footage dated January 6, 2021, depicts Bond and Conlon at the Capitol's Northwest Courtyard—adjacent to the Senate Wing Door area.  *See* Gov't's Exhibit 1 (provided separately).  Conlon carried a sign displaying the phrase "STOP THE STEAL" and "#StopTheSteal," and Bond carried a flag.  As a line of MPD officers attempted to move the crowd back, an officer wearing a body-worn camera pushed away another rioter, and Conlon, who was nearby, yelled "back off."  The officer then physically pushed Bond and Conlon away, as the pair attempted to remain in place while officers continued to advance.

Pictures taken by Bond also depict his and Conlon's progression toward windows flanking the Senate Wing Door that were previously broken by other rioters.  *See* Image 6 and Image 7.



Image 6



Image 7

Just before approximately 3:10 p.m., Bond and Conlon approached the Senate Wing Door near the northwest quadrant of the Capitol grounds.  At approximately 3:10 p.m., Capitol CCTV shows that Bond and Conlon entered the Capitol as part of the mob through a broken window next to the Senate Wing Door.  *See* Image 8 and Image 9.[2]



Image 8



Image 9

---

[2] In these and some additional Images, Bond and Conlon are marked with red arrows.

Bond paused in the broken window to observe the crowd and hold up his phone, presumably to take pictures or record video. *See* Image 10 and Image 11.



Image 10



Image 11

Bond's photograph from the broken windows depicts multiple riot-gear-equipped officers facing the larger crowd of rioters.  *See* Image 12.



Image 12

As other members of the mob attempted to enter through the broken window, Bond stepped down from the window and waited for Conlon to enter—also through the broken window.  *See* Images 13 through 15.



Image 13



Image 14



Image 15

Once they were through the window, Bond pulled out his phone and took a picture of the hallway.  *See* Images 16 through 18 (Image 18 is Bond's picture).



Image 16



Image 17


Image 18

As they progressed, Bond and Conlon passed by multiple law enforcement officers, including riot-gear-clad U.S. Capitol Police officers. *See* Image 19.[3]



Image 19

---

[3] Officers are marked with a green arrow.

Bond and Conlon then made their way to office S-140—a sensitive area known as the Senate Spouse's Lounge—of which Bond took a picture from the hallway. *See* Image 20.



Image 20

Bond and Conlon then turned around and headed towards the Senate Wing Doors, where they exited through another broken window at approximately 3:13 p.m.   *See* Image 21 and Image 22.



Image 21



Image 22

At this point, Bond took several more pictures of his and Conlon's progression, including pictures depicting other broken Capitol windows, rioter graffiti, and officers in riot gear armed with riot shields squaring-off against the mob.  *See* Images 23 through 28.



Image 23



Image 24



Image 25



Image 26



Image 27



Image 28

Third party videos captured Bond and Conlon standing in various areas outside the Senate Wing Door area.  *See* Gov't's Exhibits 2 and 3 (provided separately).  One third-party video captured Bond and Conlon from an exterior perspective as they exited through the other broken Senate Wing Door window.  *See* Gov't's Exhibit 4 (provided separately).

At approximately 4:22 p.m., over an hour after Bond and Conlon exited the Capitol Building, MPD officer body-worn camera footage captured Bond and Conlon as they remained with a crowd near the Northwest Courtyard observing ongoing clashes between rioters and law enforcement officers.  *See* Exhibit 5 (provided separately).  Bond stood close by as the officer carrying the body-worn camera recovered from being tackled by a rioter and pulled out a can of pepper spray.  Conlon is also shown nearby with her phone raised—either filming or photographing the fighting.

*Defendant Conlon's Social Media Statements*

Prior to January 6, 2021, Conlon made a number of statements on social media regarding the outcome of the 2020 Presidential Election and referencing her hope for violence. For example, on November 6, 2020, Conlon posted a Facebook comment stating "Remember HALF of America stands WITH Trump. Even if he loses.. you better believe we have strength and guns[.]" On December 20, 2020, Conlon posted a Facebook status stating that "[t]he Revolutionary War was won by only 4% of the population! Stand strong patriots[.]" Leading up to January 6, Conlon's Facebook account made several references to the upcoming rally that "should be epic."

Following January 6, Conlon made multiple statements downplaying her involvement in the attack on the Capitol and shifting blame for the events of the day to law enforcement officials. For example, Conlon made the following statements in private messages to another individual: (1) "Just an FYI I wasn't one of the ones that stormed and broke into the Capitol. I got there like an hour and a half after that. I was in the back. I jumped in a window walked down a hallway then turned around and jumped right back out. I didn't break anything or do any violence. I got tear gassed when they were pushing everyone away[;]" (2) "No I definitely was NOT one of the mob that stormed the Capitol and started attacking police[;]" (3) "it was actually the police that got violent with the people I was around. They started pushing and shoving everyone[.]"

Conlon temporarily deactivated her Facebook account on or soon after January 6. Thus, Conlon's public activity on Facebook largely ceased for a period of time following the riot.

*Defendant Conlon's Post-Riot, Pre-Arrest Activity*

On May 17, 2022, after scheduling a self-surrender with the FBI for the following day, Conlon was caught attempting to hide an AR-15 style firearm and associated ammunition from the FBI—a deceitful stunt that sent three nearby schools into lockdown. As was discussed during the

status hearing on August 16, 2022, Conlon, upon being asked if she possessed a weapon, told the FBI that the only gun she possessed was a shotgun that had been stolen.  She spoke to the FBI at approximately 10:30 a.m.  At approximately 1:25 p.m., Conlon was captured on surveillance footage from a local medical clinic hiding a weapon near a bush.  When local police responded, they found a rifle case containing an AR-15-style firearm and a box containing over seven-hundred rounds of ammunition, including dozens of rounds of ammunition loaded into multiple magazines. *See* Image 29.



Image 29

The location of the weapon's hiding spot was near three schools, including within 1,000 feet of a middle school.  All three schools went into an emergency lockdown until the situation was resolved.  Conlon later stated that she lied and hid the firearm because she did not want the FBI to find it in her home and think she was a "terrorist."  Conlon was not charged locally for the incident.

*The Charges and Plea Agreement*

On May 3, 2022, the United States charged Conlon by criminal complaint with violating (1) 18 U.S.C. § 1752(a)(1)—Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority; (2) 18 U.S.C. § 1752(a)(2)—Disorderly and Disruptive Conduct in any Restricted Building or Grounds; (3) 40 U.S.C. § 5104(e)(2)(D)—Disorderly Conduct on Capitol Grounds; and (4) 40 U.S.C. § 5104(e)(2)(G)—Parading, Demonstrating, or Picketing in a Capitol Building.  On May 18, 2022, the United States charged Bond by a 4-count Information with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G).  On May 17, 2022, law enforcement officers arrested Conlon.  On September 23, 2022, pursuant to a plea agreement, Conlon pled guilty to Count Four of the Information, charging her with a violation of 40 U.S.C. § 5104(e)(2)(G).  By plea agreement, Conlon agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Conlon now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000.  The defendant must also pay restitution under the terms of her plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence.  Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the

defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the § 3553(a) factors weigh in favor of 60 days of incarceration, a 36-month term of probation, 60 hours of community service, and $500 in restitution.

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Conlon's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) how the defendant reacted to violence; (3) how the defendant reacted to property destruction; (4) whether, during or after the riot, the defendant destroyed evidence; (5) the length of the defendant's time inside of the building and exactly where the defendant travelled; (6) the defendant's statements on social media; (7) whether the defendant cooperated with or resisted commands from police officers; and (8) whether the defendant demonstrated remorse or contrition. For a misdemeanor defendant like Conlon, the absence of violent or destructive acts is not a mitigating factor. Had Conlon engaged in such conduct, she would have faced additional criminal charges.

One of the most important factors in Conlon's case is her pre-arrest attempt to conceal a firearm from the FBI.  Conlon's actions were deceitful, opportunistic, and took advantage of the leeway granted to her. Leaving a weapon with hundreds of rounds of ammunition in a public space near schools—minimally hidden— placed numerous persons at an unnecessary and dangerous risk.

Another important factor in Conlon's case is her entrance into the Capitol Building and continued presence on restricted Capitol grounds despite witnessing numerous physical altercations between rioters and law enforcement at the Capitol, including her witnessing officers trying to push rioters away and her yelling "back off" at officers.  Likewise, Conlon's lack of reaction to the property destruction and chaos caused on January 6, 2021, is also an important factor.  Conlon's nonchalant attitude while climbing through a broken Capitol window *twice* and taking pictures on her phone of every memorable event she encountered demonstrate that she failed to grasp the gravity of her conduct.

To be sure, Conlon's ready decision to plead guilty is mitigating conduct that deserves due consideration.  But this does not readily demonstrate genuine remorse or a complete understanding of the gravity of her conduct.  In comparison to Bond, who cooperated immediately with the FBI once contacted, Conlon was decidedly uncooperative, as she took advantage of the leeway she was given to voluntarily surrender to instead attempt to deceive investigators.  And while Conlon remained in the Capitol for a small amount of time, she stayed with the mob near her area of entry, despite frequent appearances of large numbers of law enforcement officers, for much longer: over one hour.

Accordingly, the nature and the circumstances of this offense establish the need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of Conlon

Conlon resides in Martinsburg, West Virginia.  She is 58 years old.  She works as a nurse. As set forth in the Presentence Investigation Report, Conlon pled guilty on November 17, 2011, to a DUI charge in Montgomery County, Maryland, for which she was sentenced to probation.  In connection with that DUI, Conlon also pled guilty to resisting/interfering with an arrest, to which she was sentenced to probation before judgment.

Additionally, Conlon was arrested on April 7, 2015, by the Police Department in St. Louis County, Missouri, and charged with Assault on Law Enforcement.  According to the Presentence Investigation Report, no disposition on this charge is available.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41–42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Certain aspects of this case suggest a heightened need for specific deterrence. For one, Conlon's willingness to trespass into the Capitol grounds and push into the building through a broken window by the Senate Wing Door causes great concern. Conlon's willingness to remain in a violent mob for over an hour is likewise concerning. Moreover, Conlon's attempts to hide a firearm and deceive the FBI, the events of which caused a local panic, call for significant deterrence. Here, the United States submits that a brief period of incarceration and a term of probation will appropriately deter a defendant with a criminal history and who lied to the FBI in the early stages of the case, but who generally remained in compliance with all conditions of release and did not personally engage in violence at the Capitol.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence Conlon based on her own conduct and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot.

Conlon has pleaded guilty to Count Four of the Information, charging her with parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply,

---

[4] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in

the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out,

you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previously sentenced case contains precisely the same exact balance of aggravating and mitigating factors present here, the following cases offer points of comparison that may aid this Court's analysis. One way to compare Conlon to other cases is to examine other cases where defendants did not directly engage in violence during the breach of the Capitol.

For example, in *United States v. Meteer*, 21-cr-630 (CJN), the defendant breached the Capitol after he followed a mob of rioters that overran the police at the Upper West Terrace Staircase and remained in the Capitol for 31 minutes.  He celebrated this action and, following January 6, expressed a lack of remorse by repeatedly downplaying the violence that occurred.  He also had a criminal history and allegedly possessed firearms in his home, despite being prohibited from doing so due to a prior felony conviction.  The defendant pled guilty to 40 U.S.C. § 5104(e)(2)G), and the Court sentenced him to 60 days' imprisonment and a 36-month term of probation.

In *United States v. Vuksanaj*, 21-cr-620 (BAH), the defendant entered the Capitol, walking past signs of violence including broken glass and rioters climbing into the building through broken windows.  He spent 40 minutes in the Capitol and was present for two physical clashes with police. The defendant also had a criminal history with eight prior convictions, including one felony, and was found with four firearms during his arrest.  The defendant pled guilty to 40 U.S.C. § 5104(e)(2)(G), and the Court sentenced him to 42 days' intermittent confinement and 3 months' home detention as part of a 36-months term of probation.

In *United States v. Sorvisto*, 21-cr-320 (ABJ), the defendant entered the Capitol through the Senate Wing Doors and ignored multiple warning signs that it was unlawful to enter the Capitol building such as broken glass and the blare of the security alarm.  The defendant later instructed an associate to delete photos of the defendant from inside the Capitol.  The defendant pled guilty to violating 18 U.S.C. § 5104(e)(2)(G), and the Court sentenced him to 30 days' incarceration.

In *United States v. Buhler*, 21-cr-510 (CKK), the defendant ignored rioters scaling the scaffolding over the northwest staircase as she entered the Capitol through the Senate Wing Doors and entered and remained in the Senate Gallery, a sensitive area of the Capitol. Buhler also cheered

as rioters physically crushed U.S. Capitol Police officers at the East Rotunda door.  Buhler pled

guilty to violating 18 U.S.C. § 5104(e)(2)(G), and the Court sentenced her to 30 days' incarceration

and 36 months of probation.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is

"only one of several factors that must be weighted and balanced," and the degree of weight is

"firmly committed to the discretion of the sentencing judge."  *United States v. Coppola*, 671 F.3d

220, 254 (2d Cir. 2012).  The § 3553(a) factors that this Court assesses are "open-ended," with the

result that "different district courts may have distinct sentencing philosophies and may emphasize

and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its

own set of facts and circumstances regarding the offense and the offender."  *United States v.*

*Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence

differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have

sentenced that defendant."  *Id*. at 1095.

## V.    A sentence of probation may include imprisonment as a condition of probation.

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563.

Among the discretionary conditions of probation a sentencing court may impose is a requirement

that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other
> intervals of time, totaling no more than the lesser of one year or the term of
> imprisonment authorized for the offense, during the first year of the term of
> probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility"

to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983

WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over

weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*[5]

Section 3563(b)(10) authorizes a sentencing court to impose one or more intervals of imprisonment as a condition of probation.  18 U.S.C. § 3653(b)(10).  Section 3563(b)(10) authorizes sentencing courts to impose up to a year (or the authorized statutory maximum) of imprisonment, which the defendant must serve during the first year of probation.  *Id.*  Thus, for a violation of 40 U.S.C. § 5104(e)(2)(G), Section 3563(b)(10) facially permits a sentencing court to require the defendant to serve up to six months in prison as a condition of probation.  *See* 40 U.S.C. § 5109; 18 U.S.C. § 3563(b)(10).  Any imprisonment term imposed as a condition of probation must be served during "nights, weekends or other intervals of time." § 3563(b)(10).

Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation); *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999) ("[S]ix months is not the intermittent incarceration that this statute permits.").

---

[5] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).

Typically known as "intermittent confinement," a sentencing court may impose multiple intervals of imprisonment under Section 3563(b)(10). *See Anderson*, 787 F. Supp. at 539. Section 3563(b)(10) thus authorizes this Court to impose more than one imprisonment interval, where each such interval is no more than 14 days. *See, e.g.*, *United States v. Cameron*, 22-cr-17 (TFH), ECF No. 36 (D.D.C. Aug. 17, 2022) (imposing 30-day imprisonment sentence (ten three-day intervals) and three years of probation); *United States v. Vuksanaj*, 21-cr-620 (BAH), ECF No. 43 (D.D.C. Apr. 29, 2022) (imposing 42-day imprisonment sentence (three 14-day intervals) and three years of probation); *United States v. Reed*, 21-cr-204 (BAH), ECF No. 177 (D.D.C. Apr. 14, 2022) (same); *United States v. McCreary*, 21-cr-125 (BAH), ECF No. 46 (D.D.C. Apr. 1, 2022) (same); *United States v. Howell*, 21-cr-217 (TFH), ECF No. 41 (D.D.C. Mar. 8, 2022) (imposing 60-day imprisonment sentence (six 10-day intervals) and three years of probation); *United States v. Schornak*, 21-cr-278 (BAH), ECF No. 71 (D.D.C. Feb. 18, 2022) (imposing 28-day imprisonment sentence (two 14-day intervals) and three years of probation). Imposing an intermittent confinement sentence with 60 days of imprisonment as a condition of probation is appropriate in this case.

To be sure, earlier in the investigation of the January 6 attack on the Capitol, the government refrained from recommending intermittent confinement sentences given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. At this point, however, multiple jury trials have successfully occurred, *see* Standing Order No. 22-64 (BAH), at 3 (D.D.C. Nov. 9, 2022) (noting that the Court has "forg[ed] ahead" and eas[ed] the backlog" of criminal cases since the

Omicron surge began to abate in February 2022), and general COVID trends appear to show a decrease in cases.[6]

### VI.   A sentence imposed for a petty offense may include both imprisonment and probation.

The government's recommended sentence of 60 days in prison and 36 months of probation is also permissible under 18 U.S.C. § 3561(a)(3).  As Judge Lamberth observed, Section 3561(a)(3) "permits a sentencing judge to impose a term of probation at the same time as a term of imprisonment when a defendant is sentenced to imprisonment for only a petty offense or offenses." *United States v. Little*, 590 F.Supp.3d 340, 350 (D.D.C. 2022); *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022).  Because the government has briefed a sentencing court's authority to impose a split sentence for a defendant convicted of a single petty offense in this Court and the D.C. Circuit, those arguments are not elaborated further here.[7]

### VII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Conlon to 60 days of incarceration, a 36-month term of probation, 60 hours of community service, and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of her behavior, while recognizing her acceptance of responsibility for her crime.

---

[6] *See* Centers for Disease Control and Prevention, COVID Data Tracker, *available at* https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last viewed Nov. 21, 2022).

[7] The defendant's appeal of the split sentence imposed in *Little* is pending.  The D.C. Circuit heard oral argument on November 2, 2022.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      */s/ Nathaniel K. Whitesel*
NATHANIEL K. WHITESEL
Assistant United States Attorney
DC Bar No. 1601102
601 D Street NW
Washington, DC 20530
nathaniel.whitesel@usdoj.gov
(202) 252-7759

38

## <u>CERTIFICATE OF SERVICE</u>

On this 21st day of December, 2022, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

*/s/ Nathaniel K. Whitesel*
NATHANIEL K. WHITESEL
Assistant United States Attorney
DC Bar No. 1601102
601 D Street NW
Washington, DC 20530
nathaniel.whitesel@usdoj.gov
